IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUSAN APTAKER                          :
                                       :          CIVIL ACTION
        v.                             :
                                       :          NO. 14-2255
BUCKS COUNTY INTERMEDIATE              :
UNIT No. 22                            :

**MEMORANDUM**

**SURRICK, J.**                                    **SEPTEMBER  3 , 2015**

Presently before the Court is Defendant's Motion for Summary Judgment.  (ECF No. 22.)

For the following reasons, the Motion will be denied.

I.      **BACKGROUND**

Plaintiff Susan Aptaker was a special education teacher for Defendant Bucks County

Intermediate Unit ("BCIU") from 2005 through 2013, when she was terminated.  After her

termination, she brought claims against Defendant for disability discrimination, failure to

accommodate, and retaliation, asserting that she was unfairly criticized and ultimately terminated

after disclosing to her supervisors that she was suffering from depression.

A.      **Factual Background**[1]

1.      *Plaintiff's Employment History with the BCIU*

Plaintiff began her employment with the BCIU in August of 2005.  (Pl.'s Dep. 40, Pl.'s

Resp. Ex. A, ECF No. 3.)  From 2005 through 2012, Plaintiff was a Special Education Teacher

_____

[1] The factual background is taken from the parties' Statements of Undisputed Material Facts, to the extent the facts are admitted or otherwise undisputed.  Where the parties dispute certain facts, those disputes are noted.  In addition, the facts have been taken in the light most favorable to the plaintiff as the non-moving party, with all reasonable inferences drawn in her favor.

in the Autistic Support Program at Truman High School.  (*Id.*)  At Truman, she taught students primarily ranging in ages 18 to 21 who suffered from autism, developmental disabilities, and behavioral problems.  (*Id.* at 40-43.)  Her teaching at Truman involved a functional life skills curriculum, which focused on vocational and prevocational skills, community-based instruction, and life skills.  (*Id.* at 43.)  She was responsible for six to nine students in her classroom.  (*Id.*)  Plaintiff's supervisors at Truman were Travis Keys and Darren Shartle.  (*Id.* at 42.)  At Truman, Plaintiff consistently received "satisfactory" ratings on her evaluations, and the comments from supervisors were positive.  (Truman Evals., Pl.'s Resp. Exs. B & C.)

Plaintiff was transferred to Neshaminy High School for the 2012-2013 academic school year because the class that she taught at Truman no longer existed.  (Pl.'s Dep. 41, 45; Robert-Malamis Dep. 22-27, Def.'s Mot. Summ. J. Ex. 2; Change of Status Form, Def.'s Mot. Summ. J. Ex. 10.)  At Neshaminy, Plaintiff was also a Special Education Teacher in the Autistic Support Program.  (Pl.'s Dep. 43.)  She was qualified for the position at Neshaminy.  (Connolly Dep. 29, Pl.'s Resp. Ex. E.)   Her position at Neshaminy was different in that her students were younger, and the program was more academic-focused, requiring her to teach low-level math and reading to students.  (Pl.'s Dep. 45-46.)  Plaintiff had four students at Neshaminy, each of whom had an Individualized Education Program ("IEP").  (*Id.* at 57.)  Her supervisors were:  Steven Schumacher, Special Education Supervisor; and Judy Hengst, Director of Autistic Support.  (Schumacher Dep. 10-11, Pl.'s Resp. Ex. F; Hengst Dep. 10.)  When Plaintiff began at Neshaminy, performance expectations were not communicated to her.  (Pl.'s Dep. 53-54.)[2]
Shannon McMahon, the Program Coordinator for the Autistic Support Program at the BCIU,

---

[2] Defendant disputes this fact.  Schumacher testified that he met with Plaintiff and her classroom assistants during the first week of classes to explain to them his expectations.  (Schumacher Dep. 25-26.)  Schumacher also stated that prior to the beginning of the 2012-2013 school year, he provided all teachers, including Plaintiff, with lesson plans.  (*Id.* at 62.)

provided curriculum support and training to the special education teachers.  (Schumacher Dep. 20; McMahon Dep. 11, Def.'s Mot. Summ. J. Ex. 5.)  McMahon assisted Plaintiff with evaluating student IEPs and schedule development.  (Schumacher Dep. 19-20.)  McMahon met with Plaintiff in September, at Plaintiff's request.  (McMahon E-mail, Pl.'s Resp. Ex. G.)[3]

### 2.    *The October 17, 2012 Meeting*

A meeting took place on October 17, 2012.  Present were Schumacher, Hengst, and Plaintiff.  (Schumacher Dep. 27; Pl.'s Dep. 54-55.)  Plaintiff believed the purpose of the meeting was to discuss expectations for the upcoming school year.  (Pl.'s Dep. 61.)[4]  At the meeting, Schumacher and Hengst discussed Plaintiff transitioning to Neshaminy, submitting lesson plans, following student behavior plans, and organization in the classroom.  (Pl.'s Dep. 69-75; Hengst Dep. 41; Dec. 27, 2012 Mem, Def.'s Mot. Summ. J. Ex. 12.)  Expectations for the year were communicated to Plaintiff.  (Pl.'s Dep.  64-65.)  At Truman, Plaintiff was not required to submit daily lesson plans.  (*Id*. at 44.)  A summary of the October 17 discussion topics was not memorialized until December 27, 2012.  Hengst and Schumacher jointly drafted a Memorandum summarizing this meeting and a subsequent meeting held on December 18, and sent the Memorandum to Plaintiff.  (Dec. 27 Mem.)[5]

---

[3] Schumacher stated that he requested McMahon to meet with Plaintiff because he observed weaknesses in Plaintiff's teaching after having visited her classroom.  (Schumacher Dep. 22-23.)  We resolve all disputes in favor of Plaintiff.

[4] Schumacher stated that he initiated the meeting because Plaintiff had not yet submitted lesson plans and he wanted to see what they looked like.  (Schumacher Dep. 26.)

[5] The December 27 Memorandum states, in relevant part:

On 10/17/12, Steve and Judy met with Sue and discussed the following:
- Sue's concern with change in placement
- Use of lesson plans
- Following of Behavior Plans

Plaintiff became emotional at the October 17 meeting, and began to cry.  (Pl.'s Dep. 66, 76, 81.)  She shared that she was having personal issues.  (Schumacher Dep. 41-42.)  Plaintiff did not express that she was having symptoms of depression, or any other condition, since she had not been formally diagnosed at that time.  (*Id*. at 41-42; Pl.'s Dep. 81, 125.)  Schumacher and Hengst suggested that Plaintiff contact the Employee Assistance Program ("EAP").  (Schumacher Dep. 42-43; Pl.'s Dep. 76.)  Plaintiff's expression of emotions, and her supervisors' suggestion that she contact EAP was not reflected in the December 27 Memorandum that summarized this meeting.  (Pl.'s Dep. 76.)

### 3.   *EAP Counseling and Mental Health Treatment*

Within a few weeks of the October 17 meeting, Plaintiff contacted EAP, and began seeing EAP therapist, Veronica Owens.  (Pl.'s Dep. 76-77; Owens Dep. 18-19, Pl.'s Resp. Ex. H.)  Owens diagnosed Plaintiff as having generalized anxiety.  (Owens Dep. 28-29.)  Multiple stressors contributed to Plaintiff's anxiety, including feeling overwhelmed at work, the recent death of her father, the death of one of her dogs, and damage done to her home as a result of a

---

- Organization in the classroom including individual student schedules

During the meeting, we discussed additional supports such as time with the program coordinator, behavior analyst and coordination with previous teacher with certain students.  Steve and Judy explained that Sue should have looked at all the IEP's and behavior plans prior to the start of school and that the behavior plans and self & match should have been in place on day one.

(Dec. 27 Mem.)  Plaintiff does not dispute that each of these topics were discussed at the meeting.  (Pl.'s Dep. 69-74.)  Plaintiff also does not dispute that supports were provided to her after the October 17 meeting. (*Id*. at 65, 75-77.)  However, Plaintiff contends that academic supports were provided to all teachers, and dismisses Defendant's contention that supports were provided only to Plaintiff as a result of performance concerns.

hurricane.  (*Id*. at 31.)[6]  Owens believed that Plaintiff also suffered from situational depression, and referred Plaintiff to a psychiatrist, Dr. Barbara Davis.  (Owens Dep. 36.)   Plaintiff saw Dr. Davis for the first time on December 10, 2012.  (Davis Notes, Pl.'s Resp. Ex. I.)  Dr. Davis diagnosed Plaintiff with Major Depressive Disorder ("MDD"), and prescribed medication. Plaintiff visited Dr. Davis approximately 18 times over the course of a year.  Dr. Davis was not deposed in this matter.

### 4.   *The December 18, 2012 Meeting*

On December 18, 2012, Plaintiff met with Schumacher, Hengst, and Paul Connolly, Plaintiff's union representative.  Plaintiff requested the meeting in order to share with her supervisors that she was being treated for depression, but that she was "resolving the problem through medication and through therapy."  (Pl.'s Dep. 79, 82.)  Plaintiff told her supervisors that she was having a difficult year professionally, and that she was not the teacher that she once was. (*Id*. at 85-87.)  Plaintiff specifically stated that she "was having difficulty professionally because the depression . . . was making it difficult to learn at the rate that was expected of [her]" and that "she did not feel like [her]self."  (*Id*. at 85-86.)

Plaintiff requested to be temporarily placed in a less stressful position while she attempted to manage her depression.  (*Id*. at 82.)  She suggested a "prep sub" or a "floating sub" position.  (*Id*.)  A "prep sub" is assigned to various classrooms around the Bucks County School District to provide special education instruction in accordance with student IEPs.  (Robert-Malamis Dep. 102-103.)  A "floating sub" is a substitute teacher placed in any classroom where the BCIU needs a substitute teacher on a daily basis.  (*Id*. at 104)  Plaintiff requested to be placed

---

[6]  Typically, individuals that seek Owens' services through EAP participate in approximately three to eight counseling sessions.  (Owens Dep. 32.)  However, because Owens and Plaintiff believed that Plaintiff could benefit from the emotional support, Plaintiff continued to see Owens on a regular basis.  (*Id*. at 32-33.)

in either of those positions because she believed that they would involve less pressure and because she recalled that the BCIU had placed other employees in those positions when going through a difficult time.  (Pl.'s Dep. 89-90 (stating that she knew of a classroom teacher that was temporarily placed in a prep sub position so that she had time to take care of her dying mother).)[7] As a prep sub or floating sub, Plaintiff would not have to write lesson plans or IEPS, and would not have to attend IEP meetings with parents.  (Pl.'s Dep. 90.)  Plaintiff does not dispute the fact that she did not use the word "accommodation" when she requested to be transferred to a floating sub or prep sub position.  (*Id*. at 82-83.)

The prep sub and floating sub positions are considered long-term substitute positions. (Roberts-Malamis Dep. 102.)  Neither position is meant to be filled by contract employees.  They are generally reserved for teachers with little experience.  (*Id*. at 104-105; *see also* Paul Dep. 32 ("[Putting Plaintiff in a prep or floating sub position] didn't seem like the appropriate kind of thing since prep sub positions were not full time positions, and they were long term sub positions not intended for contract staff.").)  Defendant believed that placing Plaintiff in one of these positions would have been considered a demotion and therefore inappropriate for a contract teacher.  (Paul Dep. 33.)  The responsibilities of a floating and prep sub are much different than for a regular teacher.  (Connolly Dep. 36-39 (noting that these positions are "not even in the same ballpark" as the position of a regular teacher).)  At the time Plaintiff made this request, the BCIU claimed that it did not have any openings for prep or floater subs.  (Hengst Dep. 62; Paul

---

[7]  Plaintiff gave other examples of contracted teachers being placed in prep and floating sub positions.  She stated that a music therapist and art therapist were experienced teachers that worked as subs in the classroom.  (Pl.'s Dep. 139.)  Rebecca Robert-Malamis testified that these two teachers did not have full caseloads for the 2012-2013 school year.  (Roberts-Malamis Dep. 93-94.)  "[S]o rather than demote the teachers to a less than full time caseload, [the BCIU] filled out their caseload by allowing them to do prep sub work."  (*Id*.)  This allowed the teachers to keep the same salary.  (*Id*.)

Dep. 34; Def.'s Ans. to Interrogs. 18, Def.'s Summ. J. Mot. Ex. 15.)  However, Plaintiff

submitted evidence reflecting that the BCIU posted multiple job openings from December 18,

2012 through April of 2013—the relevant time frame for purposes of this case—for various long

term substitute special education positions.  (*See* Pl's Resp. Ex. Y.)

       Hengst advised Plaintiff that she would look into Plaintiff's request to be transferred to a

prep sub or floating sub position.  (Pl.'s Dep. 82-83.)  Hengst and Schumacher also raised

concerns about Plaintiff's performance.  (Dec. 27 Mem.; Connolly Dep. 26.)[8]  At the end of the

meeting, Plaintiff was directed to contact Human Resources regarding her options for the

remainder of the year.  (Pl.'s Dep. 100; Dec. 27 Mem.)  It was suggested that Plaintiff take a

leave of absence.  (Pl.'s Dep. 102, 131-32.)

                  5.       *Plaintiff Follows Up with Human Resources*

       Shortly after the December 18 meeting, Plaintiff followed up with Human Resources

about her options.  (Pl.'s Dep. 101-103, 131-32.)  Plaintiff received the necessary paperwork for

taking a leave of absence from Human Resources.  (*Id.* at 103; Jan. 4, 2013 E-mail, Def.'s Mot.

Summ. J. Ex. 16.)  Plaintiff would have been entitled to approximately 19-20 sick days if she

were to have taken FMLA leave.  (Pl.'s Dep. 102.)  Ultimately, based in part on the advice of her

doctors, Plaintiff decided not to take the approximate one-month FMLA leave of absence

because she did not believe it would be good for her depression.  (*Id.* at 103.)

---

       [8]  The December 27 Memorandum, which Hengst and Schumacher sent to Plaintiff, also
included a summary of the issues raised during the December 18 meeting.  It included Plaintiff's
request to be temporarily reassigned to a prep or floating sub position, and Hengst's response to
same.  (Dec. 27 Mem.)  It also stated that Schumacher reported concerns from parents of some of
Plaintiff's students, and that he had sent e-mails to Plaintiff regarding lesson plans and progress
reports not being completed on time.  (*Id.*)  In June of 2013, after Plaintiff had been notified
about her termination, Hengst received two written complaints from parents by e-mail.  (Parent
E-mails, Def.'s Mot. Summ. J. Ex. 31.)  The December 27 Memorandum made no mention of
that fact that Plaintiff was being treated for depression.  (Dec. 27 Mem.)

6.      *January 23, 2013 Observation, Evaluation, and Corrective Action Plan*

The first formal observation of Plaintiff's classroom took place on January 23, 2013, by

Hengst and Schumacher.  (Hengst Dep. 25; Jan 23, 2013 Eval., Def.'s Mot. Summ J. Ex. 28.)

Plaintiff had approximately one week to prepare for the observation.  (Pl.'s Dep. 111.)  The

evaluation that was prepared in conjunction with the observation rated Plaintiff unsatisfactory in

all categories, except for "professionalism" and rated her unsatisfactory overall.  (*Id.* at 107; Jan.

23 Eval.)  Plaintiff does not contest certain observations made in the January 23 Evaluation, for

example that the lesson was not aligned with the lesson plan, and that some students appeared to

have regressed in their behavior.  (Pl.'s Dep. 112-119.)[9]

As a result of the unsatisfactory evaluation, Plaintiff was placed on a Corrective Action

Plan ("CAP").  A meeting was held on February 6, 2013, to discuss the unsatisfactory evaluation

and placement on the CAP.  (Pl.'s Dep. 133; CAP E-mails, Def.'s Mot. Summ. J. Ex. 19.)

Hengst, Schumacher, Plaintiff, Connolly, and Rebecca Malamis, Director of Human Resources,

attended the meeting.  (Pl.'s Dep. 133; CAP, Def.'s Mot. Summ. J. Ex. 18.)  At the meeting,

Plaintiff again raised her depression diagnosis, noting that the medication would not "work

overnight."  (Connolly Dep. 31-32.)  Hengst advised Plaintiff that her request to be temporarily

transferred to a floater or prep sub position could not be accommodated.  (Connolly Dep. 31-33.)

The CAP had twelve separate directives, including contacting other staff members to set

up meetings, hosting video lessons, submitting schedules and lesson plans, reviewing

instructional videos, and performing observations of other classrooms.  (CAP.)  Connolly

testified that this was a "very aggressive" CAP.  (Connolly Dep. 28.)  Both Connolly and

---

[9] However, Plaintiff contends that the reason that the lesson was not aligned with the plan
was because one of the students was absent that day.  She also defends the student's behavior by
stating that the regression made sense because the students were still adjusting to a new teacher.

Plaintiff had an opportunity to express concerns about the CAP prior to Plaintiff agreeing to it. (Connolly Dep. 56; CAP E-mails.)  Roberts-Malamis asked Plaintiff prior to her agreeing to the CAP if she needed to take time off from work, and Plaintiff stated that she did not.  (Pl.'s Dep. 156; Roberts-Malamis Dep. 50-51.)  Roberts-Malamis also reminded Plaintiff of the consequences of a second unsatisfactory evaluation—recommendation for termination.  (Pl.'s Dep. 157; Apr. 28, 2013 Mem. 4, Def.'s Mot. Summ. J. Ex. 20.)  Plaintiff was generally skeptical about the CAP, stating that she "was not okay with the idea that on top of [her] work in the classroom under difficult circumstances that [she] would not have all of these other things to do."  (Pl.'s Dep. 134.)  Plaintiff agreed to the CAP, however, "because that was what [her] supervisors wanted [her] to do to prove that [she] was committed to doing [her] job."  (*Id*.)

On April 24, 2013, a mid-point review of the CAP took place.  (Pl.'s Dep. 151; Hengst Dep. 77; Apr. 28, 2013 Mem., Def.'s Mot. Summ. J. Ex. 20.)  Plaintiff, Connolly, Roberts-Malamis and Hengst attended the meeting.  Plaintiff's depression was not discussed.  (Pl.'s Dep. 152.)  At the meeting, Hengst acknowledged some of the actions under the CAP that Plaintiff accomplished.  (Apr. 28 Mem.)  However, concerns were also raised, including Plaintiff's inability to follow timelines under the CAP, "which continue to reflect her competence in the area of preparation and planning along with her professionalism."  (*Id*.)  Plaintiff acknowledged that she submitted untimely lesson plans under the CAP.  (Pl.'s Dep. 153.)  However, Plaintiff also states that whatever lesson plans she submitted to Hengst were not satisfactory, even though Plaintiff had received help from other teachers in creating them.  (Pl.'s Dep. 144-45.)[10]

---

[10] Plaintiff defended her untimeliness by stating that she had been excused from submitting late lesson plans on account of computer issues and medical problems associated with her arthritis.  (Pl.'s Dep. 153.)

7.     *Medical Documentation of Plaintiff's Depression*

On May 20, 2013, Plaintiff provided the BCIU with a medical note from Owens.  (Pl.'s

Dep. 161-64; Owens Dep. 43-45; Owens May 5, 2013 Ltr., Def.'s Mot. Summ. J. Ex. 21.)  Due

to concerns that she was going to lose her job, Plaintiff requested that Owens send a letter to the

BCIU regarding Owens' ongoing treatment of Plaintiff.  (Owens Dep. 43-44.)  The letter is

directed to Rebecca Roberts-Malamis, Director of Human Resources, and is dated May 5, 2013.

The letter states:

> Please be advised that Ms. Aptaker has been in counseling with the undersigned
> psychotherapist since November 9, 2012.  She has been suffering from depression
> and anxiety exacerbated by the stressors of her current position.  She is being seen
> twice a month. I have also referred her for medication to help alleviate her
> symptoms.
>
> In terms of ability to perform her job, Susan is more than capable of performing
> the specific job duties, but finds it extremely stressful and anxiety provoking in an
> atmosphere of continuing criticism, with very limited acknowledgement of her
> professional capabilities. The undersigned psychotherapist is recommending a
> more understanding perspective of her particular stressors in the current position.

(Owens May 5 Ltr.)

Plaintiff agreed with Owens that she was more than capable of performing her specific

job duties.  (Pl.'s Dep. 163; Owens Dep. 74.)  Nobody in BCIU's Human Resources Department

ever contacted Owens in response to her May 5 letter.  (Owens Dep. 47-48.)

8.     *May 24, 2013 Evaluation*

A second formal observation of Plaintiff's classroom took place on May 16, 2013.

(Hengst Dep. 83.)  Plaintiff was evaluated by Hengst and Lezley Dale, the Supervisor of Special

Education.  (Pl.'s Dep. 165; Dale Dep. 17-24, Def.'s Mot. Summ. J. Ex. 4; May 24, 2013 Eval.,

Def.'s Mot. Summ. J. Ex. 22.)  At the time of the observation, Dale did not supervise Plaintiff,

had no prior interactions with her, and was unaware that Plaintiff was on a CAP, or had been

10

treated for depression.  (Dale Dep. 7-8, 23.)  The observation lasted approximately 30 minutes.  (*Id*. at 30.)  Dale felt that there were some positives to Plaintiff's performance.  Dale also felt, however, that Plaintiff was unprepared for the class, and that Plaintiff's instructional outcomes were unclear.  (*Id*. at 18-23.)  Plaintiff stated that she was very nervous during the observation.  (Pl.'s Dep. 166.)

Hengst prepared the second evaluation of Plaintiff, which was based on formal and informal observations, Plaintiff's performance under the CAP, and input from Dale.  (Hengst Dep. 86.)  A review of the May 24 Evaluation reveals that it was based, predominantly, on the 30-minute observation of Plaintiff's classroom on May 16.  (May 24 Eval.)  Plaintiff was rated unsatisfactory in the domain areas of planning and preparation, classroom environment, instructional delivery, and professionalism.  She received an overall unsatisfactory rating on this evaluation.  (May 24 Eval.)  A meeting was held on May 24, 2013, where Plaintiff was provided with the unsatisfactory evaluation.  (Roberts-Malamis Dep. 83; May 24 Eval.)  Plaintiff admitted that lesson plans were turned in late during the first half of the CAP, but stated that during the second half, they were always on time and satisfactory.  (Pl.'s Dep. 167.)  She stated that she had trouble completing some of the extended school year (ESY) paperwork, and that one of her student's progress IEP reports was incomplete.  (Pl.'s Dep. 159, 168-169.)  During the meeting, Plaintiff was informed that the BCIU was going to recommend that she be terminated.  (*Id*. at 178.)

        *9.*    *Plaintiff's Termination from BCIU*

On June 26, 2013, the BCIU sent Plaintiff a letter indicating that it was going to recommend to the Board of School Directors that she be terminated for unsatisfactory performance.  (Pl.'s Dep. 179-80; June 26, 2014 Ltr., Def.'s Mot. Summ. J. Ex. 24.)  Plaintiff

was placed on inactive employee status pending arbitration, effective August 26, 2013.  (Sept. 17, 2013 Ltr., Def.'s Mot. Summ. J. Ex. 25.)  Plaintiff is currently suspended, and her grievance is being held in abeyance.  (Connolly Dep. 82-83.)[11]  Plaintiff is presently employed as a special education instructor for a company called Supplemental Health Company.  (Pl.'s Dep. 186.)

### 10.    *Plaintiff's Treatment for Depression and Anxiety*

Plaintiff's problems began when she started at Neshaminy.  (Pl.'s Dep. 57.)  In November 2012, she began treatment with Owens, who diagnosed her with generalized anxiety.  She began treatment with Dr. Davis in December 2012.

Plaintiff testified that as a result of her depression, she cried a lot.  (Pl.'s Dep.  27-28.)  She also testified that her depression caused problems with concentration.  Specifically, she testified that she would lose concentration approximately five to six times a week for about five to ten minutes each episode.  After five to ten minutes, she was able to regain focus.  (*Id*. at 33-37.)  After going on medication, her ability to concentrate improved.  She lost focus about three to four times a week, for five to ten minutes each episode.  (*Id*. at 34.)  Plaintiff stated that she had a difficult time processing a lot of new information, and with organization.  (*Id*. at 29.)  Plaintiff believed that she had Attention Deficit Disorder (*id*.), and expressed this belief to both Owens and Dr. Davis (Davis Notes; Owens Dep. 30.)  Plaintiff had trouble sleeping, and indicated to Dr. Davis that she could sleep only four to five hours each night.  (Davis Notes.)  Her sleep improved once she started taking medication.  (*Id*.)  Plaintiff testified that she felt like a different person, which caused her to feel unhappy, and to socialize less.  (*Id*. at 37-38.)

---

[11] For purposes of this Memorandum, and for ease of reference, we state that Plaintiff was "terminated" by the BCIU, even though her status is technically an inactive employee. Plaintiff has not been actively employed by the BCIU in over two years, nor has she received any salary from them during this time.  Moreover, the parties do not dispute that Plaintiff's suspension and placement on inactive employee status constitutes an adverse employment action.

Owens testified that she believed Plaintiff's triggers initially were related to work stressors, the death of her father, the death of one of her dogs, and damage to her home as a result of a hurricane.  (Owens Dep. 31.)[12]

Plaintiff first saw Dr. Davis on December 10, 2012.  (Davis Notes.)  Dr. Davis prepared a letter dated January 8, 2015, which indicated that Plaintiff suffered from MDD, and had been diagnosed as of December 2012.  (*Id*.)  Dr. Davis prescribed depression medication for Plaintiff, and continued to meet with Plaintiff bi-weekly for over a year.  (*Id*.)  Plaintiff complained to Dr. Davis about feeling anxious and depressed, and issues with sleeping and concentrating.  (*Id*.)

### B.    Procedural History

On June 25, 2014, Plaintiff filed an Amended Complaint.  (Am. Compl., ECF No. 7.) Plaintiff asserts claims under the Americans with Disabilities Act ("ADA") for discrimination, failure to accommodate, and retaliation.  (Am. Compl. ¶¶ 25-33.)  Plaintiff also asserts identical claims under the Pennsylvania Human Relations Act ("PHRA") for discrimination, failure to accommodate, and retaliation.  (*Id*. at ¶¶ 34-36.)

On March 16, 2015, Defendant filed the instant Motion for Summary Judgment.  On April 14, 2015, Plaintiff filed a Response to the Motion, which included a Memorandum of Law, Statement of Material and Disputed Facts, and a Response to Defendant's Statement of Asserted Material and Undisputed Facts.  On April 28, 2015, Defendants filed a Reply.  (Def.'s Reply, ECF No. 26.)

---

[12] Owens also stated that when she was suspended, her symptoms improved because she "didn't have [Hengst] breathing down her back, in her words."  (Owens Dep. 110.)  Owens believes that Plaintiff's current symptoms are a result of ongoing litigation with the BCIU.  (*Id*. at 86-88, 119 ("The lawsuit, all the litigation, the EEOC claims.  I think the anxiety—the primary triggers for the anxiety are this not being resolved.").)  Owens believed that Plaintiff was capable of performing her job, even with her diagnosis.  (Owens May 5 Ltr.)

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   DISCUSSION

Plaintiff's claims under the ADA and PHRA center on her allegation that she was a

victim of discrimination and retaliation by the BCIU after she informed her supervisors that she

suffered from, and was taking medication for, depression.  Plaintiff also claims that Defendant

failed to reasonably accommodate her disability, despite her request for a temporary transfer

position.  Defendant seeks dismissal of all ADA and PHRA claims asserted by Plaintiff,

contending that, based on the record of undisputed facts, Plaintiff does not suffer from a

disability under the ADA or PHRA, and Defendant's decision to terminate her was appropriate

under the circumstances.

### A.   Disability Discrimination Claim Under ADA and PHRA[13]

Defendant argues that summary judgment is appropriate because Plaintiff was terminated

for poor performance, and not because of her disability.  Plaintiff responds that the performance-

related complaints did not arise until after she informed her supervisors about her diagnosis of

depression.  Plaintiff contends that this raises an inference that the reprimand and subsequent

termination was motivated by unlawful discriminatory intent.

Under the ADA, employers are prohibited from discriminating against "a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

---

[13] The legal standards and analysis applicable to ADA claims is substantively identical to discrimination claims under the PHRA.  *See Rinehimer v. Cemcolift*, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (noting that the statutes are interpreted in accord with one another, and "[t]herefore, our disposition of [the plaintiff's] ADA claim applies with equal force to his PHRA claim."); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105-06 (3d Cir. 1996).  The parties combined their arguments in their briefing, and do not dispute that the standards are the same.  We will therefore address Plaintiff's ADA and PHRA claims collectively.

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

A plaintiff asserting an ADA claim may proceed using the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973).  *See Walton v. Mental Health Ass'n of Southeastern Penn.*, 168 F.3d 661, 667-68 (3d Cir. 1999) (applying the *McDonnell Douglas* burden shifting rules to ADA claims).  Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.  If a plaintiff successfully states a *prima facie* case, the burden shifts to the defendant to articulate some legitimate non-discriminatory reason for its employment decision.  *Id*.  If the defendant succeeds, the burden then shifts back to the plaintiff to show that the employer's stated reason for the employment action was merely a pretext for intentional discrimination.  *Id*. at 804.

### 1.   *Prima Facie Case*

To establish a *prima facie* case of discrimination under the ADA, "a plaintiff must show (1) that [s]he is disabled within the meaning of the ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result of the discrimination."  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).  Defendant does not dispute that Plaintiff has established the second element in that she was qualified for her position, with or without reasonable accommodations.  Our focus, therefore, will be on the first and third factors of Plaintiff's *prima facie* case.

a.   <u>Disability</u>

A "disability" under the ADA may be found in one in three ways.  A plaintiff is disabled if she shows:  "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1); *see also Sulima*, 602 F.3d at 185.  Plaintiff claims that she has presented sufficient evidence under the first and third prongs.  Specifically, Plaintiff contends that she has a mental impairment that substantially limits major life activities, and that Defendant regarded her has having such an impairment.

With respect to either prong, we must first determine whether Plaintiff has presented sufficient evidence of a mental impairment.  In her Amended Complaint and during her deposition, Plaintiff indicated that she suffered from depression.  In addition, Dr. Davis diagnosed Plaintiff with MDD in a January 8, 2015 letter to Defendant.  Defendant does not dispute that Plaintiff's diagnosed depression may be considered a mental impairment.  Plaintiff has therefore established that she suffers from a mental impairment—depression—for purposes of her *prima facie* case.[14]

---

[14] Plaintiff argues that, in addition to depression, the Court should consider diagnoses of Generalized Anxiety Disorder and Attention Deficit Disorder ("ADD") in determining whether she suffers from a disability under the ADA.  Plaintiff did not mention these two disorders in her Amended Complaint.  In addition, when asked during her deposition whether she suffered from a disability, she responded in the affirmative, that she "currently suffers from depression."  (Pl.'s Dep. 15.)  When counsel asked whether she suffered from any other disorder, she answered in the negative.  (*Id.*)  Plaintiff's therapist, Veronica Owens, diagnosed Plaintiff with generalized anxiety as early as May 5, 2013, in a letter to Defendant.  Plaintiff filed her Amended Complaint over a year and a half later, on June 25, 2014.  If Plaintiff wished to allege generalized anxiety as a disability, she had ample time to do so.  In addition, Plaintiff has not submitted any evidence that she has been diagnosed with ADD.  She testified at her deposition that Dr. Davis diagnosed her as having ADD.  However, nowhere in Dr. Davis' notes is there any mention that Plaintiff

Next, we must consider whether Plaintiff's depression substantially limits one or more major life activities.[15]  "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i).  Whether a major life activity has been substantially limited "requires an individualized assessment" of the facts.  29 C.F.R. § 1630.2(j)(1)(iv).  The EEOC Regulations state that "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  Id. at § 1630.2(j)(1)(ii).  The impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  Id.  The regulations also state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage," and that "it is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  "Whether an individual is

---

suffers from ADD.  The only notation Dr. Davis makes is that Plaintiff complained about ADD, and that symptoms would be monitored.

Moreover, although neither party has presented the Court with Plaintiff's EEOC charge, to the extent that neither ADD nor Generalized Anxiety Disorder were listed as disabilities in the EEOC charge, Plaintiff's claims as they relate to those disabilities would be barred for failure to exhaust administrative remedies.  *See Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010); *Danao v. ABM Janitorial Servs.*, No. 14-6621, 2015 U.S. Dist. LEXIS 65418, at *45-46 (E.D. Pa. May 19, 2015) (dismissing ADA claims on a motion to dismiss where the plaintiff alleges disabilities that were never included on his EEOC charge of discrimination).  At this juncture, we will only consider depression in our determination of whether Plaintiff suffers from a disability under the ADA.

[15] We rely on the definitions set forth in the Amended ADA.  Congress amended the ADA in 2008 with the passage of the ADA Amendments Act of 2008 ("ADAAA").  The amendments became effective on January 1, 2009.  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4(a), 122 Stat. 3553, 3555.  In doing so, Congress rejected Supreme Court precedent that construed the Act strictly, and declared that "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals, under this [Act], to the maximum extent permitted by the terms of this [Act]."  42 U.S.C. § 12102(4)(A).

substantially limited in a major life activity is a question of fact." *Cohen v. CHLN, Inc.*, No. 10-514, 2011 U.S. Dist. LEXIS 75404, at *18 (E.D. Pa. July 13, 2011) (citations omitted).

Plaintiff states that her depression substantially limits her ability to "think, communicate, and concentrate."  (Pl.'s Facts Stmt. ¶ 124.)  Plaintiff also contends that her impairment "impact[s]" her "daily functioning," "social interactions," and "sleep habits."  (Pl.'s Resp. 23.)

Concentrating and thinking are major life activities.  42 U.S.C. § 12102(2)(A).  Plaintiff argues that her ability to concentrate is substantially limited as a result of her depression and anxiety.  The evidence reflects that when she was first diagnosed with depression, Plaintiff lost concentration approximately five to six times per week.  Each of these episodes lasted approximately five to ten minutes, after which time, she regained focus.  After receiving medication, Plaintiff reported that her symptoms improved.  She lost concentration only three to four times per week, each time for about five to ten minutes.[16]  Plaintiff believed that she had ADD, and complained to both of her treating doctors about symptoms of ADD, including becoming distracted and feeling "scattered."  (Owens Dep. 123.)  Even though Plaintiff ultimately chose to pursue a treatment course that focused on her depression, the fact that she consistently complained about symptoms of ADD demonstrates that she had persistent difficulties with concentration and focus.  Plaintiff also expressed difficulties with organization, processing new information, and remembering things.

Sleep is also a major life activity.  42 U.S.C. § 12102(2)(A).  The evidence reflects that Plaintiff had difficulties sleeping.  When she was first diagnosed with Major Depressive

---

[16] Under the ADA, we may not consider Plaintiff's symptoms while on medication in determining whether her concentration was substantially limited.  *See* 29 C.F.R. § 1630.2(j)(1)(vi) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures.").

Disorder, Plaintiff could only sleep four to five hours a night.  Her sleep improved with medication; however, there were times when she reported to Dr. Davis that her sleep was impaired even on the medication.

Based on all of this evidence, and taking into consideration the less restrictive standards set forth in the Amended ADA, we are satisfied that a reasonable factfinder could conclude that Plaintiff's ability to sleep, concentrate, and think were substantially limited as compared to most people in the general population.[17]  Defendant argues that Plaintiff's condition was a temporary, non-chronic impairment of a short duration, and as such, is not covered by the ADA.  Defendant relies on cases that were decided prior to the ADA Amendments, which renounced the constrictive nature of the standards for determining whether a daily life activity is substantially limited.  (*See generally*, Def.'s Mot. 11-12.)  The Amended ADA expressly rejects the practice of looking at the duration of the impairment as a criterion in determining whether it was substantially limiting.  *See* 29 C.F.R. § 1630.2(j)(1)(ix) (noting that "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.").  In addition, there is nothing in the ADA that delineates chronic from non-chronic impairments.  Rather, when considering whether an individual suffers from a disability, the court looks to whether the impairment substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.

---

[17] Even though we find that Plaintiff's sleep, concentration, and thinking were substantially limited, the evidence does not support a finding that Plaintiff's "daily functioning" and "social interactions" were substantially limited.  Plaintiff testified that there was no interest or hobby that she could do before her depression was diagnosed that she could not do after the diagnosis.  Plaintiff had no problems with driving, and did not present any evidence that other aspects of her daily functioning were impaired.  Plaintiff also testified that she did not socialize "as much" if she was "having a bad day," (Pl.'s Dep. 38), however, if she wanted to, she had no problem "interact[ing] with people, call[ing] them, or go[ing] to parties."  (*Id*. at 38-39.)

In light of this standard, the evidence supports a finding that Plaintiff suffers from a disability under the ADA.

Although Plaintiff has met her burden in proving that she suffers from a disability under the first prong of the definition of disability, she has failed to present sufficient evidence to support the third prong of the definition:  that she was "regarded as" disabled.  "[A] plaintiff meets the requirement of being 'regarded as' disabled if she establishes discrimination 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'"  *Estate of Murray v. UHS of Fairmount, Inc*., No. 10-2561, 2011 U.S. Dist. LEXIS 130199, at *17 (E.D. Pa. Nov. 10, 2011) (citing 42 U.S.C. § 12102(3)(A)).  This type of disability claim "focuses not on [Plaintiff] and [her] actual abilities, but rather on the reactions and perceptions of the persons interacting or working with [her]."  *Kelly v. Drexel Univ*., 94 F.3d 102, 108-09 (3d Cir. 1996).

Plaintiff argues that there is sufficient evidence for the jury to conclude that Plaintiff was terminated due to perceived disabilities.  In support, Plaintiff states that when she disclosed that she suffered from depression and requested reassignment to a prep or floating sub position, Hengst questioned whether Plaintiff could "handle" such positions.  Plaintiff relies on the testimony of Paul Connolly, the union representative, who attended the meeting where this conversation took place.  Connolly's testimony is as follows:

> Q.    I want to discuss the second full paragraph where you state, Judy states that floating/prep sub is usually, underlined, last resort for contractual staff.  Is that what you wrote?
>
> A.    Yes, that's right.
>
> Q.    She never said that it wasn't a possibility; she just indicated that it was a last resort?

A.      It's not usual, and it's true.  Most of the folks in the sense that we talked about contracts, no.  Not unprecedented but it doesn't typically happen.

Q.      Judy asked if Sue could handle many different classes.  Do you see that?

A.      Yes.

Q.      At or about that time, this 12/18/12 meeting, did Ms. Hengst express concerns over Ms. Aptker's ability to even handle the responsibilities of a floating or prep sub?

A.      Well, I think that what was going on here, she was concerned about her performance in her own classroom.  And I think what was going on here, she was responding to –you know, typical prep sub will be in during the week, five, six, seven different classes depending on where your assignment is.  The same thing with a floating sub, you could be in a different classroom every day and I think that's what she was asking her. All right, can you handle the fact that you maybe in a different classroom every day?

(Connolly Dep. 88-89.)

Plaintiff misconstrues Connolly's testimony.  Contrary to Plaintiff's assertion, this testimony does not suggest that Defendant, and in particular, Hengst, regarded Plaintiff as having a disability.  The testimony reflects Hengst's concerns about whether Plaintiff, who had already indicated issues in her classroom of only four students, would be able to take on a position that required traveling to multiple classrooms with numerous students.  The testimony does not support the inference that Hengst believed that Plaintiff was incapable of performing in "less demanding positions" because of Plaintiff's stress and depression.

        b.      <u>Suffered an Adverse Employment Action as a Result of Her Disability</u>

Having determined that Plaintiff suffered a disability, we must determine if Plaintiff presented sufficient evidence to support the third of prong of her *prima facie* case:  whether she suffered an adverse employment action as a result of her disability.  Defendant contends that Plaintiff is unable to show that her termination was the result of her disability because

performance-related issues were raised prior to Plaintiff notifying her supervisors that she suffered from depression.  Defendant also contends that despite being provided academic supports, Plaintiff's performance continued to suffer.

The facts contained in the summary judgment record give rise to a genuine dispute regarding whether Defendant's decision to terminate Plaintiff was the result of her disability.  It is not disputed that Plaintiff first informed Defendant about suffering from depression at the December 18 meeting.  Defendant contends that Hengst and Schumacher raised performance-related issues at the October 17 meeting.  However, Plaintiff's understanding was that the purpose of the October meeting was to "discuss expectations for the school year" in light of the fact that she was a new teacher at Neshaminy and they were new supervisors.  (Pl.'s Dep. 61.) Plaintiff believed that all new teachers at Neshaminy had similar meetings with their supervisors. Although Hengst raised a few critical things during the October meeting, the overall tone from Plaintiff's perspective was one of support.  It was not until the end of December—after Plaintiff had disclosed her depression diagnosis—that Plaintiff received for the first time a summary of the October meeting, which indicated concerns with her performance.  Shortly after disclosing her diagnosis, Plaintiff was subjected to performance reviews, an aggressive Corrective Action Plan, unsatisfactory evaluations, and ultimately termination.  A reasonable factfinder could conclude that Defendant's complaints about Plaintiff's performance were contemporaneous with her disclosing her disability, and that this suspicious timing raises an inference of discrimination. Plaintiff has established her *prima facie* case of discrimination under the ADA.

2.    *Legitimate Non-Discriminatory Reason for Adverse Employment Action and Pretext*

Defendant has articulated a legitimate non-discriminatory reason for terminating Plaintiff's employment with the BCIU.  As stated above, Defendant contends that Plaintiff's termination was the result of Plaintiff's unsatisfactory work performance in the classroom.  The evaluations and the comments made during meetings with her supervisors support this proffered reason.  The burden shifts back to Plaintiff to establish that Defendant's stated reason is merely a pretext for discrimination.

In order to establish pretext, Plaintiff must point to evidence that:  "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;" or that 2) permits the factfinder to reasonably conclude "that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994). With respect to the first prong, to discredit the employer's proffered reason, a plaintiff

> cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes*, 32 F.3d at 765 (internal quotation marks and citations omitted).  "'[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'"  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)); *see also Coulton v. Univ. of Pa.*, 237 F. App'x 741, 747 (3d Cir. 2007).

As evidence of pretext, Plaintiff points to two categories of circumstantial evidence: evidence of unusually suggestive timing, and evidence of antagonism.  With respect to the first, Plaintiff contends that the timing of Plaintiff's discipline in relation to when she disclosed her disability is suspicious.  She points to evidence that she had no negative performance evaluations for her entire tenure at the BCIU, until immediately after she put the BCIU on notice of her depression and requested a temporary accommodation.  Plaintiff argues that this evidence also reveals Defendant's antagonism towards her, and that this pattern of antagonism supports a finding that Defendant's decision to terminate her was pretext for discrimination.  (*See* Pl.'s Resp. 13 (stating that Plaintiff "became the target of successive and relenting discipline and criticism of her work performance").

The timing between Plaintiff's disclosure of her depression and request for accommodation and Defendant's subsequent termination may be considered in the pretext analysis.  *See Walton v. Mental Health Ass'n*, 168 F.3d 661, 669 (3d Cir. 1999).  However, considerations of timing require "some logical connection between the timing . . . and the possibility of the particular discrimination at issue."  *Id.*  Plaintiff notified her supervisors of her disability and requested a reasonable accommodation in December of 2012.  Just over a month later, on January 23, 2013, Plaintiff underwent her first formal classroom observation and evaluation, which resulted in an overall unsatisfactory designation.  Within a couple weeks, Plaintiff was placed on an aggressive Corrective Action Plan where she was forced to undertake numerous tasks in addition to her daily teaching responsibilities, all after having just requested a temporary, less stressful, placement to manage her depression.  In addition, the acute criticism of Plaintiff's performance, which began immediately after she disclosed her disability, is suspicious in light of the fact that she had seven prior years of positive evaluations while employed by

Defendant, without any indication of performance issues.  The evidence shows a logical connection between the time Plaintiff notified her supervisors of her depression, and the aggressive, almost unattainable Corrective Action Plan, which ultimately resulted in her termination.

Although neither party raised this issue, we note that the possibility that Plaintiff's performance issues correlated with her symptoms of her depression (e.g., difficulty concentrating, thinking, and sleeping) plays into our consideration of whether Defendant's proffered reason was pretext.  *See Kurten v. Hanger Prosthetic and Orthotics, Inc.*, 402 F. Supp. 2d 572, 588 (W.D. Pa. 2005) (denying summary judgment on ADA discrimination claim, stating that the court "cannot analytically consider the Defendant's proffered legitimate reason for terminating the Plaintiff apart from the Plaintiff's alleged cognitive disability which may have caused the Plaintiff's poor performance").  Plaintiff complained about difficulties with concentrating, sometimes while she was at work, and stated that she often became distracted and scattered.  Plaintiff also had difficulties processing new information, and remembering things.  It is reasonable to infer that these symptoms may have, in part, been the reason that Plaintiff failed to turn in lesson plans and IEP progress reports on time, or failed to complete lesson plans to the specifications of her new supervisors.  The complexity of cognitive disabilities, such as Plaintiff's depression, when analyzed in the context of deficient performance as the proffered reason for an adverse employment action, requires a delicate factual assessment that is more appropriate for a jury to undertake than the Court.

Defendant contends that timing does not support an inference of pretext because six months elapsed between the time Plaintiff disclosed her depression and the time she was terminated.  However, we need not limit our analysis to these two discrete time frames.  Rather,

we must focus on all the evidence, including the intervening events, to determine whether the facts support a finding of pretext.  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997) (explaining that courts should focus on whether the "evidence is sufficient based on the whole picture" when analyzing pretext); *see also Andrews v. City of Phila.*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."); *Welsh v. Automatic Data Processing, Inc.*, 954 F. Supp. 2d 670, 674-675, 684 (S.D. Ohio 2013) (considering the fact that the plaintiff received a reprimand one month after disclosing disability, and was terminated over a year after the disclosure, in denying summary judgment of ADA discrimination claim).  Based on the entire record, we are satisfied that the evidence offered by Plaintiff casts sufficient doubt upon Defendant's proffered reason for terminating her, so that a factfinder could reasonably conclude that Defendant's reason was a fabrication, or merely pretext for discrimination.

### B.      Failure to Accommodate Claim Under ADA and PHRA

Defendant also seeks judgment as a matter of law on Plaintiff's claim that Defendant failed to provide a reasonable accommodation.  The ADA provides a remedy when an employer fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).

Plaintiff contends that Defendant violated the ADA because it failed to engage in good faith in the interactive process.  To show that an employer failed to engage in the interactive process, Plaintiff must demonstrate that:  1) Defendant knew about her disability; 2) she

requested accommodations or assistance for her disability; 3) Defendant did not make a good faith effort to assist Plaintiff in seeking accommodations; and 4) Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith.  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3rd Cir. 1999).  The ADA regulations provide that, "it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of the accommodation" to "identify the precise limitations."  29 C.F.R. § 1630.2(o)(3).  The Third Circuit has held that "both employer and employee have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 771 (3d Cir. 2004) (citation omitted).  Plaintiff may not succeed on this type of claim without showing that the requested accommodation was "possible."  *Id*. at 772.

Defendant argues that Plaintiff did not seek an accommodation under the standards set forth in the ADA because Plaintiff did not provide Defendant with sufficient information to trigger the interactive process.  "The law does not require any formal mechanism or 'magic words,' to notify an employer . . . that an employee needs an accommodation."  *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003).  Instead, the employee must "provide[] the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation."  *Taylor*, 184 F.3d at 313; *see also Conneen*, 334 F.3d at 332 ("[E]ither by direct communication or other appropriate means, the employee 'must make clear that [he/she] wants assistance for his or her disability.'" (quoting *Jones v. United Parcel Serv*., 214 F.3d 402, 408 (3d Cir. 2000))).  The employee need not use the words "reasonable accommodation" in order to trigger the employer's duty to engage in the interactive process.  *Taylor*, 184 F.3d at 313.

28

At the December 18 meeting, Plaintiff advised her supervisors that she was diagnosed with, and was being treated for, depression.  She also told them that she didn't feel like she was the teacher she had once been.  Plaintiff requested temporary placement in a floating or prep sub position because either of those positions would be less stressful.  (*See* Connolly Dep. 27.)  Although Plaintiff did not use the words "reasonable accommodation," Plaintiff's request to be temporarily reassigned coupled with her disclosure about being diagnosed with depression put Defendant on notice that Plaintiff suffered from a disability and requested a reasonable accommodation.  Defendant's argument that Plaintiff did not provide sufficient information to trigger the interactive process fails.  Based on the undisputed evidence, it is clear that Plaintiff requested a reasonable accommodation for her depression.

Defendant also argues that, even if Plaintiff requested an accommodation, Defendant made a good faith effort to assist in reasonably accommodating her disability by offering her a leave of absence.  Once Plaintiff requested the temporary transfer to a floating or prep sub position, this request triggered the requirement that Defendant engage in good faith in an interactive process.  At this point, the burden is on the employer to request additional information that the employer believes it needs to identify a reasonable accommodation or to establish that no accommodation is possible.  *Taylor*, 184 F.3d at 315.  There is very little evidence in the record demonstrating that Defendant engaged in an interactive process after being notified about Plaintiff's depression and request to be temporarily placed in a different position.  Defendant never followed up with Plaintiff, or with her doctors, to inquire further about Plaintiff's symptoms or limitations.  In addition, despite Hengst's representation that she would look into the possibility of a floating or prep sub placement, there is no evidence in the record that Hengst or Schumacher inquired of Human Resources whether this would have been

possible.  Instead, Defendant offered Plaintiff one month of FMLA leave, which Plaintiff stated would be counterproductive in her healing process.  After Plaintiff turned down this offer, Defendant's efforts to assist in finding an accommodation ceased, and it instead pursued an aggressive course of action to evaluate Plaintiff's teaching abilities, with serious consequences. Despite Defendant's contention, offering Plaintiff one month of FMLA leave as a compromise, without looking into any other possibilities, did not evidence good faith under the circumstances.

Finally, Defendant argues that Plaintiff could not have been reasonably accommodated because there were no vacant prep sub or floating sub positions at the time Plaintiff requested reassignment, and that even if those positions were available, they are not appropriate for full-time contract teachers like Plaintiff.  Disputed issues of fact exist regarding whether substitute positions were available at the time Plaintiff made the request.  Hengst stated that the BCIU was not hiring for floating or prep sub positions.  However, Plaintiff submitted evidence that the BCIU had posted openings for substitute special education positions at the time, and after Plaintiff made the request.  In fact, on the day that Plaintiff first indicated her desire to be temporarily transferred to a prep or floating sub position, Defendant had published a posting for two floating substitute teacher positions.  (*See* Pl.'s Resp. Ex. Y.)  The record also reveals a dispute as to whether prep and floating sub positions were appropriate for full-time teachers, such as Plaintiff.  Defendant argues that prep and floating sub positions were not intended for contract teachers, but were instead reserved for part-time inexperienced teachers.  However, Plaintiff testified that she knew of at least three contract teachers who had been placed in floating or prep sub positions, one of whom was placed in the substitute position in order to cope with a difficult personal issue.  Viewing the evidence in Plaintiff's favor, we are compelled to deny Defendant's motion for summary judgment as to Plaintiff's failure-to-accommodate claim.

### C.       Retaliation Claim Under ADA and PHRA

Defendant also seeks summary judgment on Plaintiff's retaliation claim.  Plaintiff contends that Defendant retaliated against her by subjecting her to unfair criticism and ultimately terminating her after she engaged in protected activity—seeking to be reasonably accommodated by being transferred to a prep or floating sub position.  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  Accordingly, "it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).  Requesting an accommodation is a protected activity for purposes of the ADA's anti-retaliation provision.  *See id.* at 191.

To make out a *prima facie* case of retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal relationship between the protected activity and the adverse action.  *Williams*, 380 F.3d at 759.  The burden-shifting framework of *McDonnell Douglas*, discussed above, also applies to ADA retaliation claims.  In all cases involving retaliation, a plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997).  This ultimate burden always remains with the plaintiff.  *Id.*

For all of the reasons stated above with respect to Plaintiff's ADA discrimination claim, Plaintiff's retaliation claim survives summary judgment.  Plaintiff has made out a *prima facie*

case of retaliation, and has submitted sufficient evidence to allow a factfinder to reasonably conclude that Defendant's proffered reason for terminating her was merely pretext for discrimination.  Accordingly, summary judgment on Plaintiff's retaliation claim under the ADA and PHRA will be denied.

## IV.     CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment will be denied.

An appropriate Order follows.


**BY THE COURT:**


_____

**R. BARCLAY SURRICK, J.**